UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

| | | |
|---|---|---|
| ROBERT E. DODD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:11-cv-217 |
| | ) | |
| v. | ) | Honorable Robert J. Jonker |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| _____ | ) | |

This is a social security action brought under 42 U.S.C. § 405(g) seeking review of

a final decision of the Commissioner of Social Security denying plaintiff's claim for disability

insurance benefits (DIB).  On September 25, 2006, plaintiff filed his application for benefits alleging

a March 25, 2004 onset of disability.  (A.R. 105-07).  His claim was denied on initial review.  (A.R.

57-66).  On February 23, 2009, he received a hearing before an administrative law judge (ALJ), at

which he was represented by counsel.  (A.R. 9-41).  On March 16, 2009, the ALJ issued a decision

finding that plaintiff was not disabled.  (A.R. 46-54).  On January 3, 2011, the Appeals Council

denied review (A.R. 1-5), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's

decision denying his claim for DIB benefits.  He asks the court to overturn the Commissioner's

decision on the following grounds:

1.      The ALJ committed reversible error "by failing to find that several of Plaintiff's impairments were severe impairments[;]"

2.      The ALJ committed reversible error "by not properly considering" the opinion of plaintiff's treating physician; and

3.      "The ALJ committed reversible error by not following the vocational expert's answers to accurate hypothetical questions."

(Statement of Errors, Plf. Brief at 15, docket # 13).  Plaintiff's arguments do not provide a basis for disturbing the Commissioner's decision.  I recommend that the Commissioner's decision be affirmed.

**Standard of Review**

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007).  The scope of the court's review is limited.  *Buxton*, 246 F.3d at 772.  The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations.  *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ."  42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there

exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73.  "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996) ("[E]ven if the district court -- had it been in the position of the ALJ -- would have decided the matter differently than the ALJ did, and even if substantial evidence also would have supported a finding other than the one the ALJ made, the district court erred in reversing the ALJ."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from March 25, 2004, through the date of the ALJ's decision. (A.R. 48). Plaintiff had not engaged in substantial gainful activity on or after March 25, 2004. (A.R. 48). Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine and rheumatoid arthritis. (A.R. 48). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (A.R. 48). The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of sedentary work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), allowing the claimant the option to sit or stand alternately at will provided that he is not taken off task more than 10% of the work period.  He cannot climb ladders, ropes, or scaffolds.  He cannot crawl.  Claimant may only occasionally climb ramps or stairs, balance, stoop, crouch, and kneel.  He must avoid concentrated exposure to unprotected heights.

(A.R. 49).  The ALJ found that plaintiff's testimony regarding his subjective functional limitations was not fully credible.  (A.R. 49-52).  Plaintiff was unable to perform his past relevant work.  (A.R. 52).  Plaintiff was 38-years-old as of the date of his alleged onset of disability and 43-years-old as of the date of the ALJ's decision.  Thus, at all times relevant to his claim for DIB benefits, plaintiff was classified as a younger individual.  (A.R. 53).  Plaintiff has at least a high-school education and is able to communicate in English.  (A.R. 53).  The transferability of job skills was not material to a disability determination.  (A.R. 53).  The ALJ then turned to the testimony of a vocational expert (VE).  In response to a hypothetical question regarding a person of plaintiff's age, and with his RFC, education, and work experience, the VE testified that there were approximately 13,000 jobs in southwest Michigan that the hypothetical person would be capable of performing.  (A.R. 34-39).  The ALJ found that this constituted a significant number of jobs.  Using Rule 201.28 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled.  (A.R. 53-54).

## 1.

Plaintiff argues that the ALJ committed reversible error by finding only two severe impairments:  degenerative disc disease of the lumbar spine and rheumatorid arthritis.  (Plf. Brief at 15).  He argues that the ALJ should have found that his arachnoiditis and "neck/arm impairments" were additional severe impairments.  (*Id.*).  The finding of a severe impairment at step 2 is a

threshold determination.[1]    The finding of a single severe impairment is enough and requires

continuation of the sequential analysis.  *See Maziarz v. Secretary of Health & Human Servs.*, 837

F.2d 240, 244 (6th Cir. 1987).  The ALJ found at step 2 of the sequential analysis that plaintiff had

severe impairments.  (A.R. 48).  The ALJ's failure to find additional severe impairments at step 2

is "legally irrelevant."  *McGlothin v. Commissioner*, 299 F. App'x 516, 522 (6th Cir. 2009); *see*

*Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).  The ALJ continued the sequential

analysis and considered plaintiff's severe and non-severe impairments in making his factual finding

regarding plaintiff's RFC.  (A.R. 49-52).

**2.**

Plaintiff argues that the ALJ committed reversible error by "not properly considering"

the opinion of a treating physician: Eugene Tay, M.D.  (Plf. Brief at 15-18; Reply Brief at 2-3).  The

issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved

to the Commissioner.  20 C.F.R. § 404.1527(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390

(6th Cir. 2004).  A treating physician's opinion that a patient is disabled is not entitled to any special

---

[1]"Administrative law judges employ a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Social Security Act." *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). Under the sequential analysis, "The claimant must first show that []he is not engaged in substantial gainful activity.  Next, the claimant must demonstrate that []he has a 'severe impairment.'  A finding of 'disabled' will be made at the third step if the claimant can then demonstrate that h[is] impairment meets the durational requirement and 'meets or equals a listed impairment.'  If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that []he is incapable of performing work that []he has done in the past. Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.  The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work." *White v. Commissioner*, 572 F.3d 272, 282 (6th Cir. 2009).

significance. *See* 20 C.F.R. §§ 404.1527(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician."). Likewise, "no special significance" is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling, deference. *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011). "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician. Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'" *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)). A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). An opinion that is based on the claimant's reporting of his symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see*

*also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record, the opinion should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. § 404.1527(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 652 F.3d 653, 659-61 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Rabbers v. Commissioner*, 582 F.3d 647, 657 (6th Cir. 2009).

On March 25, 2004, plaintiff was an Indiana resident. He received treatment from a series of Indiana physicians before he began his treatment in Michigan with Dr. Tay. (A.R. 376). On March 25, 2004, plaintiff appeared at Parkview Whitley Hospital complaining of low back pain. Plaintiff was an airport security screener. He stated that he had injured himself at work earlier in the day while lifting a heavy bag. (A.R. 539). His x-rays were "unremarkable," with the exception of

"mild degenerative change L4-5 with mild facet degenerative change L5-S1." (A.R. 539).  Plaintiff

was diagnosed as having a back strain.  (A.R. 539-40).  Janet Pendergast, D.O., plaintiff's treating

physician, agreed with this diagnosis.  (A.R. 307).

Plaintiff's MRI on March 30, 2004, revealed normal lumbar alignment.  It showed

"degenerative disc narrowing, L2-3, L4-5 and L5-S1, with diffuse annular disc bulge at L4-5 without

significant encroachment on the thecal sac.  Minimal degenerative central spinal stenosis [was] noted

at L4-5.  No other herniation or spinal stenosis [was] demonstrated."  (A.R. 328, 403, 537).  An

MRI of the lumbar spine in early April was interpreted as showing likely arachnoiditis at L3-4 with

clumping of the nerve roots at the cauda equina.  (A.R. 327, 436, 536).

Dr. Pendergast referred plaintiff to Isa Canavati, M.D., for a neurosurgical evaluation.

On April 15, 2004, plaintiff advised Dr. Canavati that he was not taking any pain medications.  He

stated that he had experienced an earlier episode of lower back pain in August 2003, while working

in Alaska lifting fish boxes.  (A.R. 296-98).  On April 22, 2004, plaintiff returned to Dr. Canavati.

Plaintiff's cervical spine MRI showed degenerative disc disease at the C3-4, C4-5 and C6-7 levels

with mild central disc protrusion.  There was no evidence of cord compression.  The MRI of his

thoracic spine revealed mild degenerative changes.  (A.R. 289, 290-92).  Dr. Canavati stated that

plaintiff's symptoms were "predominantly musculoligamentous in nature."  (A.R. 289).  Dr.

Canavati referred plaintiff to David Lutz, M.D., a physiatrist and chronic pain specialist at the Fort

Wayne Neurological Center.  (A.R. 289, 445).

On April 29, 2004, Dr. Lutz conducted his initial evaluation.  Plaintiff was 5'8" tall

and weighed 173 pounds.  His "[m]otor examination throughout all four extremities reveal[ed] 5/5

strength."  Dr. Lutz could not elicit any weakness.  Plaintiff's upper and lower extremity reflexes

were "2+ bilateral and symmetric." His gait was normal. His neck had a full range of motion. (A.R. 280). Dr. Lutz was unable to elicit any active trigger points. Sacroiliac testing was unremarkable. There was no evidence of atrophy. Plaintiff's muscle tone and bulk were normal. Shoulder testing was negative bilaterally for impingement. Sensory examination was normal to light touch and pinprick with the exception of decreased pinprick sensation in the left medial calf. (A.R. 281). Dr. Lutz recommended conservative treatment and released plaintiff to perform light duty work. (A.R. 281, 285, 288).

On May 17, 2004, Dr. Lutz stated that plaintiff was capable of performing light-duty work. (A.R. 278). On June 10, 2004, and July 12, 2004, Dr. Lutz repeated that plaintiff was capable of performing light-duty work. (A.R. 265, 267). On July 24, 2004, plaintiff told Dr. Lutz that he was not working because there were no light-duty jobs available. Lutz stated that plaintiff "may return to light-duty position when available." (A.R. 260). On August 9, 2004, Dr. Lutz stated: "I feel that he could return back to a light duty position with a 25-pound lifting restriction if available." (A.R. 253). Dr. Lutz administered a series of epidural steroid injections. (A.R. 230-35, 245, 248). On September 23, 2004, Dr. Lutz stated that plaintiff's "lower extremity symptomatology ha[d] essentially resolved" with two epidural steroid injections." (A.R. 233). His lower back pain symptoms had improved as well. Plaintiff's motor strength remained 5/5 in his upper and lower extremities. His straight leg raising tests were negative bilaterally. (A.R. 234).

On October 20, 2004, Dr. Lutz stated that plaintiff was capable of performing work that did not require him to lift more than 25 pounds. (A.R. 226). On October 28, 2004, Lutz noted that plaintiff was in no acute distress. His motor examination revealed 5/5 strength throughout his lower extremities. His patellar reflexes were 2+ and his straight leg raising tests were negative.

(A.R. 222).  Dr. Lutz released plaintiff "back to work" with light duty, restricting him to lifting no more than 25 pounds.  (A.R. 223).

On November 18, 2004, plaintiff's MRI revealed no evidence of disc herniation.  (A.R. 212, 217, 514).  On December 17, 2004, Dr. Lutz noted that plaintiff's symptoms would "wax and wane."  He was in no acute distress.  His motor strength remained 5/5.  Dr. Lutz offered a diagnosis of arachnoiditis.  He recommended conservative treatment.  (A.R. 212).  X-rays taken of plaintiff's right shoulder on February 4, 2005, revealed no acute bony changes or significant degenerative changes.  (A.R. 325, 509).  On February 8, 2005, Dr. Lutz noted that there were "no changes" in plaintiff's work restrictions.  (A.R. 207).

On June 15, 2005, a physical therapist indicated that plaintiff should be cleared for work for an 8-hour day if it allowed plaintiff to change positions every half hour.  (A.R. 195).  On June 30, 2005, plaintiff was examined by Kevin Drew, M.D., in connection with his worker's compensation claim.  (A.R. 590-92).  Plaintiff displayed considerable pain behaviors.  There were no signs of atrophy and plaintiff's sensation in his extremities was intact.  Dr. Drew offered an opinion that plaintiff's pain was caused by an annular tear at L4-5 that he sustained at work in March 2004.  (A.R. 590-92).

On July 7, 2005, Dr. Lutz observed that plaintiff was in no apparent distress.  His muscle strength was 5/5.  His patellar reflexes were "intact and symmetric."  (A.R. 189).  He had moderate paraspinal tenderness and a reduced lumbar range of motion.  Dr. Lutz stated that plaintiff was capable of performing sedentary work.  (A.R. 189).  The MRI of plaintiff's lumbar spine taken on August 2, 2005, revealed "mild" degenerative changes at L4-5 and L5-S1, but was otherwise

unremarkable. (A.R. 324, 401). X-rays taken of plaintiff's shoulders revealed no evidence of acute bony injury. (A.R. 261, 325).

On August 17, 2005, plaintiff returned to Dr. Lutz. He stated that he had obtained Vicodin as a result of a hospital visit earlier in the month. He was tolerating this medication without difficulty. Plaintiff displayed 5/5 power in his lower extremities. His patellar and ankle reflexes were +1. His sensory examination was grossly intact. He displayed a reduced range of motion in his spine and some pain behaviors. (A.R. 183).

In late 2005, plaintiff moved from Indiana to Michigan. (A.R. 472). In Michigan, rheumatologist Jan Ciejka, M.D., orthopedic surgeon James Ellis, M.D., and family practitioner Eugene Tay, M.D., were plaintiff's treating physicians.

On November 11, 2005, plaintiff reported to emergency room physicians at St. Mary's Healthcare that he had a history of rheumatoid arthritis which had been followed by an Indiana physician. He stated that he had moved to Michigan and had not yet established a physician. Doctors noted some tenderness in plaintiff's wrists and ankles. There were no objective signs of rheumatoid arthritic changes in plaintiff's hands. Plaintiff was awake and alert and did not appear to be in any acute distress. Plaintiff was treated and instructed to follow-up with Dr. Phillip Baty. (A.R. 430-32, 472-73). Plaintiff received similar treatment during his emergency room visits on November 17, 2005, and January 8, 2006. (A.R. 420-21, 428-29).

On January 10, 2006, plaintiff began treating with Dr. Tay. (A.R. 376). Plaintiff reported that his pain had increased in recent weeks and that he had been using "Vicodin 5/500 3-4 times daily, which barely dull[ed] the pain." Dr. Tay stated that he would refer plaintiff "to ortho spine for further evaluation." (A.R. 376).

-11-

On January 17, 2006, rheumatologist Jan Ciejka made the following findings:

> On physical examination, he is in no distress.  BP 130/84, weight 182, height 5 feet 8 inches.  Skin no rashes.  No cervical, submandibular lymphadenopathy. . . .  Extremities no edema.  Musculoskeletal exam – neck good ROM without pain of C-spine tenderness.  TMJ, AC and SC joints non-tender.  He reported pain anterior shoulders on apply test (combined extension and internal rotation).  No swelling or tenderness of either glenohumeral joint.  Elbows and wrists without synovitis.  MCP and IP joints of fingers without synovitis.  He makes 100% fists, no sclerodactyly.  There is normal ROM in his right 1st MCP joint, which apparently was fused.  No sclerodactyly. No nail pitting.  Hips good ROM.  He reported low back pain on hip internal and external rotation bilaterally.  Negative hip irritation sign.  Knees and ankles FROM [full range of motion] without synovitis or tenderness.  Mid-foot joints, MTP and IP joints of toes without synovitis or tenderness.  Thoracic spine non-tender.  Lumbar spine tenderness in mid-line.

(A.R. 340, 426).  His examination of plaintiff's records from Indiana revealed that no definitive diagnosis of rheumatoid arthritis had ever been made.  He indicated that he would have x-rays taken of plaintiff's hands, feet, and lumbar spine, and he would repeat other tests after plaintiff stopped taking Prednisone.  (A.R. 341, 427).

On February 8, 2006, Dr. Ciejka conducted a second examination, which returned similar results.  He advised plaintiff that he did not have a definite diagnosis for his chronic multiple joint pain.  "His symptoms are out of proportion to what I find on physical examination."  (A.R. 342, 424).

On February 13, 2006, plaintiff's bone scan was normal with the exception of a "single, small focus of increased uptake in the distal carpal area of the right wrist, probably representing minimal degenerative change."  (A.R. 404).

On February 17, 2006, plaintiff called Dr. Tay's office asking for more Vicodin.  Plaintiff stated that he was using 3 of the 5/500 Vicodin per day.  He had MS Contin, but was not using it because it upset his stomach.  (A.R. 379).  On March 22, 2006, plaintiff appeared at the St.

Mary's Healthcare emergency room seeking treatment for a sore right wrist. He related that a day earlier he had been working on his farm. (A.R. 418, 466). He was treated with a shot of Dilaudid and Phenergan and advised to follow-up with his family physician. (*Id.*). On March 23, 2006, plaintiff indicated that MS Contin made him drowsy. Dr. Tay gave plaintiff prescriptions for "Toradol/Dilaudid/Phenergan." (A.R. 377-78).

On March 23, 2006, plaintiff returned to his treating rheumatologist. He stated that he experienced significant right wrist pain after spending a few hours working on his lawnmower. Dr. Ciejka used a needle to withdraw a small amount of clear fluid from the wrist. There were no crystals present in the fluid. Dr. Ciejka gave plaintiff a 20 mg. injection of Kenalog and a Sulfasalazine prescription. (A.R. 344, 422).

On March 30, 2006, plaintiff's lumbar spine MRI showed normal alignment. It indicated "degenerative disc narrowing, L2-3, L4-5 and L5-S1, with diffuse annular disc bulge at L4-5 and a small broad-based central L5-S1 disc protrusion, without significant encroachment on the thecal sac. Minimal degenerative central spinal stenosis [was] noted at L4-5. No other disc herniation or spinal stenosis [was] demonstrated." (A.R. 399, 466). An April 10, 2006 MRI revealed normal lumbar alignment. Disc dessication was observed from L2-3 through L4-5. Schmorl's nodes were noted at L2-3 and L4-5, but the marrow signal was otherwise normal. Broad-based bulging was present at L4-5 and "minimal disk bulging at L5-S1." There was no disc protrusion, canal stenosis, or neural compression. (A.R. 398, 484).

On May 18, 2006, plaintiff was examined by James R. Ellis, M.D. (A.R. 351). Plaintiff related that Dr. Tay had recently prescribed MS Contin. Plaintiff did not report any side effects from taking this medication. (A.R. 351, 410). Plaintiff stated that he was married, a smoker,

and a recovering alcoholic.  (A.R. 352, 411).  On May 19, 2006, Dr. Ellis noted that there was evidence of idiopathic arachnoidosis, but "[i]t was felt that the arachnoiditis was only responsible for a small component of his pain syndrome, as his leg pain [was] minimal."  (A.R. 349).  On June 1, 2006, plaintiff returned to Dr. Ellis.  Plaintiff's chief complaint was low back pain.  He reported experiencing brief and relatively minor leg left leg pain a few times per week.  (A.R. 350).  Dr. Ellis summarized the results of plaintiff's recent bone scans: "Bone scan with SPECT from St. Mary's is reviewed.  This was read as normal.  On my review, the planar images are normal."  There was "no evidence of destructive lesion" and "no dramatic focal increased uptake."  (A.R. 350, 471).  Dr. Ellis recommended pharmacologic pain management, because plaintiff was not a candidate for surgical intervention.  (A.R. 350, 409).

X-rays of plaintiff's cervical spine taken on July 28, 2006, revealed "minimal" degenerative changes at C4-5.  (A.R. 393).  An MRI taken a month later showed "mild" degenerative changes at C4-5.  (A.R. 391-92, 468).  On September 18, 2006, plaintiff's EMG test results were normal.  (A.R. 405-07).

On November 8, 2006, plaintiff was treated at St. Mary's Healthcare.  He was complaining of an episode of intractable back pain.  He was treated in the emergency room with intravenous narcotics and "improved immediately."  (A.R. 480).  His range of motion in his back was intact and within normal limits.  Neurologically, he was alert and oriented in all three spheres.  Plaintiff had normal strength in all extremities.  His deep tendon reflexes were "+2 and symmetrical."  (A.R. 481).  Plaintiff was discharged into his wife's care with a "preliminary diagnosis of a history of an alleged exacerbation of chronic rheumatoid arthritis."  (A.R. 481).

On December 7, 2006, a state agency physician reviewed plaintiff's medical records and offered his opinion that plaintiff was capable of performing a limited range of light work.  (A.R. 544-51).

On March 5, 2007, Attorney Alan J. Shapiro wrote a letter to plaintiff specifying the statement plaintiff needed from Dr. Tay:

> We are going to need proof that is medical proof that you are not capable of performing the job as a cashier.  You indicate to me that you are undergoing treatment and take a great deal of medication.  We are going to need a medical report from your doctor verifying that the medication you take prevents you from doing the job as a cashier.  Please obtain the report.  Please talk to your doctor about this matter.

(A.R. 572).

On March 13, 2007, Dr. Tay noted that he would be completing a letter in support of plaintiff's disability claim, as well as a certification for an education loan discharge. (A.R. 560).  Dr. Tay recorded plaintiff's list of complaints about his medications:

> He has been tried on multiple pain medications, including MS Contin, Fentanyl patch, Dilaudid, various Vicodin and Norco dosages, as well as a Lidocane patch.  For the most part, these have been ineffective and/or cause significant side effects such as nausea, loss of appetite, weight loss, drowsiness, and nightmares.  He is most currently on Oxycontin 40 mg DID and Norco 10/325 one or two tabs QID as needed.  He states that this makes his pain barely tolerable.  Even at this dose he continues to report the inability to sit or stand continuously for 30 minutes.  Any movement causes pain.  Relief only comes from lying supine.

(A.R. 560).

On March 19, 2007, Dr. Tay produced this one-paragraph letter supplying the opinion requested by Attorney Shapiro:

> To Whom It May Concern:
>
> I have been asked by Mr. Dodd for a letter regarding his current medical condition and his prescription pain medications.  Please refer to my most recent office note dated 3/13/07 for

complete details. In brief, he is 41 year-old male with a history of chronic low back pain due to degenerative disc disease. He is currently on Oxycontin 40 mg twice daily with Norco 10/325 as needed. These medications sub-optimally control his pain, but cause a great deal of side effects, including nausea causing poor appetite and weight loss; they also cause drowsiness and mild confusion. Despite medication, he cannot sit or stand continuously for 30 minutes, and obtains relief only by lying flat on his back. Because of both his chronic medical condition and the nature of his narcotic prescription medications with their associated side effects, I do not believe that he is able to perform any kind of work in his current state, including that of potential cashier.

(A.R. 571).

On April 19, 2007, Dr. Tay wrote a letter to Attorney Shapiro explaining that the OxyContin and Norco he was prescribing could cause numerous side effects and suggested that the attorney review the package inserts for the medications. Plaintiff had complained of drowsiness and confusion, nausea, loss of appetite, and weight loss. Other than some weight loss, it was "otherwise difficult to objectively characterize [plaintiff's] other symptoms." (A.R. 586). Dr. Tay concluded his letter to Attorney Shapiro with this paragraph:

> To the extent I have documented above I am comfortable in these declarations. However, I will humbly point out that I am a family physician, without specialized training in the ortho-spine related issues or in occupational medicine and disability related issues. I cannot site [sic] more specific and objective physical exam findings such as range of motion degrees or specific strength measurements. Mr. Dodd has sought the care of multiple specialists in this community and his previous community in Indiana, and I would further direct you to consider utilizing these specialists for further information related to his disability case.

(A.R. 587).

Dr. Tay's progress notes for November 25, 2008, reveal that plaintiff was receiving OxyContin and hydrocodone that controlled his pain from degenerative disc disease and rheumatoid arthritis. Plaintiff suffered "0 sedation effects [and was] functional @ work." (A.R. 552).

The ALJ found that the opinions expressed by Dr. Tay were not entitled to any weight because they were mere recitations of plaintiff's subjective complaints, and the extreme restrictions

-16-

suggested were not consistent with the objective evidence or the opinions of plaintiff's other treating

and examining physicians:

> On March 19, 2007, the claimant's treating physician, Dr. Tay wrote a letter stating that the claimant takes OxyContin and Norco for low back pain caused by degenerative disk disease and that as a result, he experiences nausea, a poor appetite, and weight loss (Ex. 11F/20)[A.R. 571]. Dr. Tay also noted that the claimant cannot sit or stand continuously for 30 minutes and obtains relief only by lying flat on his back (*Id.*). Dr. Tay noted that due to the claimant's chronic medical condition and the nature of his prescription medications, the claimant is unable to perform any kind of work in his current state, including that of a potential cashier (*Id.*). The undersigned rejects the statements of the claimant's treating source because this opinion was based on the claimant's subjective complaints (Ex. 11F/35)[A.R. 586], it is not consistent with the medical records, it is conclusory and provided little explanation, and it provided no function by function analysis []. Notably, the occupation of cashier is a light duty position, and the residual functional capacity assessed herein is for sedentary work.

(A.R. 52). Dr. Tay's opinion was indeed based on plaintiff's subjective reports, and the doctor was

careful to refer plaintiff's attorney to the numerous specialists who had tested and treated plaintiff.

The reports and records of those specialists do not remotely support a finding of disability. The ALJ

gave Dr. Tay's letter the weight it deserved and based his findings on the much more extensive

records of the specialists. The ALJ complied with the requirements of the treating physician rule and

gave good reasons for rejecting Dr. Tay's opinions.

**3.**

Plaintiff argues that the ALJ's factual finding regarding his credibility is not supported

by substantial evidence. (Plf. Brief at 18-19; Reply Brief at 2). Credibility determinations concerning

a claimant's subjective complaints are peculiarly within the province of the ALJ. *See Gooch v.*

*Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The court does not make

its own credibility determinations. *See Walters v. Commissioner*, 127 F.3d at 528. The court's

"review of a decision of the Commissioner of Social Security, made through an administrative law

judge, is extremely circumscribed . . . ." *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the "substantial evidence" standard. This is a "highly deferential standard of review." *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *Buxton v. Halter*, 246 F.3d at 773; *accord White v. Commissioner*, 572 F.3d 272, 287 (6th Cir. 2009); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993).

The ALJ found that plaintiff's testimony regarding the intensity, persistence, and limiting effects of his impairments was not fully credible. (A.R. 49-52). The ALJ noted that although plaintiff was taking strong medication, he was able to participate in the hearing "closely and fully." (A.R. 49-50). In his daily activities, plaintiff continued to drive and was able to take care of his personal needs and household chores. (A.R. 49). He was able to provide care for his two dogs, drive his car "and watch television 8-10 hours a day." (A.R. 49). It was appropriate for the ALJ to take plaintiff's daily activities into account in making his credibility determination. *See Cruse v. Commissioner*, 502 F.3d 532, 542 (6th Cir. 2007); *Blacha v. Secretary of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). Plaintiff's credibility was further undermined by the absence of significant atrophy or neurological deficits. *See Crouch v. Secretary of Health & Human Servs.*, 909

F.2d 852, 856–57 (6th Cir. 1990) (the absence of atrophy and significant neurological deficits supports the Commissioner's conclusion that the claimant's allegation of severe and disabling pain was not credible); *see also Gaskin v. Commissioner*, 280 F. App'x 472, 477 (6th Cir.2008).  The ALJ's factual finding regarding plaintiff's credibility is supported by more than substantial evidence.

**4.**

Plaintiff's attack on the adequacy of the ALJ's hypothetical question to the VE is a reformulation of his unsuccessful challenge to the ALJ's credibility determination.  The ALJ found that plaintiff's subjective complaints were not fully credible.  It is well settled that a hypothetical question to a VE need not include unsubstantiated complaints.  *See Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *see also Gant v. Commissioner*, 372 F. App'x 582, 585 (6th Cir. 2010) ("[I]n formulating a hypothetical question, an ALJ is only required to incorporate those limitations which he has deemed credible.").  The ALJ's hypothetical question included all the limitations found to be credible.

**Recommended Disposition**

For the reasons set forth herein,  I recommend that the Commissioner's decision be affirmed.

Dated:   November 21, 2012          /s/  Joseph G. Scoville
                                    United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file

timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).